RXC 8/13/01 8:18

3:01-CV-01462 GENZLER V. LONGANBACH

*1*

*CMP.*

ORIGINAL

**HOSEY & BAHRAMBEYGUI**
Patrick L. Hosey, Esq. (Bar No. 164104)
Sherry S. Bahrambeygui, Esq. (Bar No. 166330)
550 West C Street, Suite 2050
San Diego, CA 92101
Telephone: (619) 231-0500
Facsimile: (619) 238-1097

Attorneys for Plaintiff
DAVID GENZLER

01 AUG 10 PM 2:24

DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GENZLER,<br><br>Plaintiff,<br><br>v.<br><br>PETER LONGANBACH, an individual; JEFFREY O'BRIEN, an individual; COUNTY OF SAN DIEGO, a governmental entity; SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, a governmental entity; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. '01 CV 1462 K (JAH)<br><br>**COMPLAINT FOR DAMAGES**<br><br>DEMAND FOR JURY TRIAL |

There is an old maxim which states that: *"The Prosecution delights in acquittal as much as conviction."* This maxim is based on the principle that it is the ethical duty of a prosecutor to seek justice and not merely convict. The defendants in this case have made a mockery of this principle.

## GENERAL OVERVIEW

This case involves a prosecutor who would stop at nothing to get what he wanted, including engaging in criminal conduct in order to secure a conviction, even if the person was innocent of the charge. The prosecutor was known within the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE as someone who was unethical and used illegal tactics. He was known to be dishonest and untrustworthy by the judiciary. But because he got convictions using these tactics, the most senior members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE did nothing to rein him in. Plaintiff, DAVID GENZLER, was a victim of this blind ambition and arrogance that led to his being wrongfully convicted and sentenced to 20 years to life in prison.

Plaintiff, David Genzler, alleges as follows:

1. Jurisdiction and venue are proper in this court because all claims arise out of 42 U.S.C. section 1983, and all events occurred in this venue and most witnesses and parties either reside in this venue or are governmental entities which acted within this venue.

2. Plaintiff demands a jury trial of the matters set forth herein.

3. Plaintiff, DAVID GENZLER (hereinafter "GENZLER") is a citizen of the United States who was (except for those times specifically set forth herein) and is, at all times relevant, a resident of the county of San Diego, California.

4. GENZLER was born on November 3, 1970.

5. The COUNTY OF SAN DIEGO by itself and acting through the office of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, is a governmental entity organized under the laws and constitution of the state of California and at all times mentioned herein maintained policies and ratified conduct which gave rise to the injuries complained of herein, including, but not limited to, a) policies of hiding, destroying, and/or suppressing evidence; b) policies of coercing and/or suborning perjury and/or a false testimony; c) policies of failing to comply with court orders which would be exculpatory to a person accused of or suspected in a criminal action; d) policies of maliciously manipulating and tainting criminal investigations; and e) hiring, employing and contracting with such individuals who would implement, apply and promote these policies.

6. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE is a subdivision of the COUNTY OF SAN DIEGO and at all times mentioned herein maintained and fostered policies which gave rise to the injuries complained of herein including, but not limited to, policies of hiding, destroying and/or suppressing evidence, as well as creating false evidence during the investigatory phases of a criminal action, and suppressing evidence which would be exculpatory to a person accused of or suspected in a criminal action and/or proceeding and, further, hiring, employing and contracting with such individuals who would implement, apply and promote the aforementioned policies.

7. Plaintiff is informed and believes, and thereon alleges, that PETER LONGANBACH (hereinafter "LONGANBACH") was at all times mentioned herein, a Deputy District Attorney (hereinafter "DDA") employed by the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and

at all times alleged herein was acting within the scope of his employment and under color of state law through his employment, agency and services.

8. Plaintiff is informed and believes, and thereon alleges, that JEFFREY O'BRIEN (hereinafter "O'BRIEN") was at all times mentioned herein, an investigator employed by or with the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and, at all times alleged herein, was acting within the scope of his employment and under color of state law through said employment, agency and services.

9. The names and/or capacities, whether individual, corporate, or otherwise of defendants, sued as DOES 1 through 100, are presently unknown to plaintiff, who identifies said defendants by such fictitious names. Plaintiff will seek leave of this Court to amend his complaint to show the true names and capacities when same become known.

10. At all times mentioned herein all defendants, and each of them, were acting as the agents, servants, co-conspirators, and/or employees of the other, and each and every of the acts performed by them were performed within the course and scope of their agency and/or were authorized, approved, ratified and/or condoned by the remaining defendants.

## INTRODUCTION

11. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE employed LONGANBACH as a prosecutor and provided him with the power to inflict irreparable harm upon the citizens of this community despite its knowledge that he violated numerous ethical and criminal laws, that he acted maliciously and in his own self-interest, and that he was the antithesis of what an honest Deputy District Attorney was supposed to be.

12. In the spring of 1996, LONGANBACH and his investigative team, which included O'BRIEN, were assigned to the GENZLER case - a street fight that resulted in the death of Dustin "Dusty" Harless. This became a very high profile and well publicized case due, in part, to the fact that the victim, Dusty Harless, was a well known surfing personality in the area.

13. In order to gain a murder conviction, LONGANBACH and his investigative team, used their administrative and investigatory function to hide evidence, destroy evidence, tamper with evidence, suborn perjury, threaten witnesses, ignore court orders, and engage in conduct which was and is clearly

illegal and unethical.

14. At all times relevant, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE maintained an administrative policy and/or practice of ignoring, condoning, and/or ratifying unethical conduct and behavior of its prosecutors.

15. The defendants, and each of them, engaged in similar conduct before LONGANBACH and O'BRIEN were assigned to the GENZLER matter.

16. The defendants' misconduct and illegal acts resulted in GENZLER being inappropriately convicted of second degree murder and sentenced to 20 years to life in prison.

17. It was only after the conviction was reversed and remanded for new trial in 1999 that the misconduct of LONGANBACH and his investigative team began to be seen and fully understood.

18. When the misconduct of LONGANBACH and his investigative team was finally discovered and disclosed outside of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE tried to protect LONGANBACH by denying the existence of exculpatory evidence, ignoring court orders not to destroy documents, continually delaying the release of materials known to exculpate GENZLER and/or demonstrate the depth and breadth of the misconduct, and interfering with the investigation into the misconduct, all in an attempt to avoid accepting responsibility for what LONGANBACH and his investigative team had done in the investigation and prosecution of the case in 1996, and in an attempt to obtain another conviction of second degree murder.

19. On or about August 25, 2000, GENZLER was exonerated of the second degree murder conviction when the jury returned a verdict of involuntary manslaughter.

20. GENZLER was sentenced on October 2, 2000.

21. GENZLER was released on February 14, 2001.

## FACTUAL ALLEGATIONS

### A. Prior to the Genzler Case, the San Diego County District Attorney's Office Knew Longanbach Was Unethical and Dishonest but Tolerated and Condoned His Conduct.

22. Before assigning LONGANBACH to the GENZLER case, the SAN DIEGO COUNTY

DISTRICT ATTORNEY'S OFFICE knew LONGANBACH had a reputation for bullying, intimidating and tampering with witnesses and that he was known to use unethical tactics to color, shade and otherwise change percipient witnesses' testimony in order to bolster the cases on which he worked.

23. Despite the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's knowledge of LONGANBACH's tactics and misconduct, he was permitted to continue prosecuting cases and was even rewarded for his efforts by being assigned high profile cases. His conduct was tolerated for several reasons, including a) that LONGANBACH's tactics resulted in the convictions which made the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, and therefore the District Attorney, look good in the public's eye; b) that LONGANBACH was friends with his superiors and District Attorney Paul Pfingst; and c) that LONGANBACH contributed to Mr. Pfingst's campaign.

24. Despite these "benefits," the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE knew LONGANBACH was creating image problems within the office and outside.

25. It was known in the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE that LONGANBACH would do whatever he thought needed to be done to accomplish his goals, even if it meant breaking the law or the State Bar's rules of professional conduct. It was also well known among the criminal defense bar and increasingly among the judiciary.

26. Specifically, current and former Deputy District Attorneys, who were assigned to offices immediately adjacent to or near LONGANBACH's repeatedly heard LONGANBACH loudly attempting to steer, color, bully, intimidate and otherwise change witnesses' testimony. Such conduct, being unethical, was discussed with supervisors, as were concerns about LONGANBACH's ethics, or lack thereof. Nothing was done.

27. This repeated tampering with witnesses and changing testimony was known before LONGANBACH was assigned to prosecute the GENZLER criminal case. The conduct continued throughout 1996, the year in which LONGANBACH actually prosecuted GENZLER.

28. Prior to 1996, LONGANBACH was also known for instructing percipient witnesses not to talk to a defendant's counsel or their investigators. Among criminal defense attorneys, he was reputed to stop at nothing, illegal or unethical conduct included, in order to obtain a conviction.

29. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's tolerance of such

conduct is tantamount to an unconstitutional administrative policy.

30. In addition to the above, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE knew LONGANBACH was willing to hide evidence and alter investigative reports so as to remove evidence and/or information which benefitted a defendant. Members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE who worked with and for LONGANBACH stated that they knew LONGANBACH "[p]ulled this shit. Everyone in this division knows he's dirty and does this shit . . . Everyone in the division knows it."

31. LONGANBACH's misconduct became so entrenched and wide spread that other Deputy District Attorneys ("DDAs") in the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE complained that LONGANBACH is "a cancer that needs to be cut out of the District Attorney's Office."

32. Much of the concern raised by other DDAs stemmed from disputes with LONGANBACH "over the ethics" of his conduct. For example, LONGANBACH was known to have requested that other DDAs prepare false paper work.

33. Some of the disputes between LONGANBACH and other DDAs were raised with top members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, and to LONGANBACH's superiors. Nothing was done.

34. LONGANBACH's unethical conduct even resulted in DA investigators refusing to work with him. In one instance, an investigator complained to a supervisor that LONGANBACH illegally instructed the investigator and police officers to return evidence in a homicide case to its original location so that a search warrant could then be obtained, thereby making the evidence admissible in court. After LONGANBACH's illegal request was reported to supervisory personnel at the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE. Nothing was done.

35. LONGANBACH's reputation for unethical conduct in investigations and prosecutions was also known by members of the judiciary.

36. A sitting judge of the San Diego County Superior Court complained about LONGANBACH's poor reputation in the legal community for honesty and ethics. Several Superior Court judges and others in the justice system expressed their concern that LONGANBACH was "a black eye on the concept of what prosecution is all about." He was widely reputed to play games with

discovery, play "hide the ball," and bully attorneys and even judges.

37. In the face of all the knowledge of misconduct and illegal behavior by the prosecutor, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's repeated failure to act and/or take any corrective action against LONGANBACH constitutes the creation of a custom and practice of permitting individual prosecutors to abuse their positions and power in order to violate the constitutional rights of community members accused of a crime.

38. LONGANBACH made two important promises to his superiors in the course of his assignment to prosecute GENZLER in 1996: First, that he could successfully recuse defense counsel from the case and that the recusal would be upheld on appeal; and second, that he would obtain a murder conviction. Both LONGANBACH and his supervisors knew that in order for LONGANBACH to keep these promises, he would inevitably violate ethical rules, criminal statutes and trample on the constitutional rights of David GENZLER. They were right.

**B. <u>The San Diego County District Attorney's Office Knew Longanbach Was Committing Prosecutorial Misconduct in the Investigation and Prosecution of Genzler.</u>**

39. During the initial investigation of the GENZLER case, it became apparent that the incident giving rise to the criminal charges against GENZLER resulted from a chance meeting that escalated into a street fight wherein Dusty Harless was unfortunately killed.

40. LONGANBACH knew that GENZLER would claim self-defense in the criminal case.

41. LONGANBACH received a copy of the initial investigative report by O'BRIEN.

42. The initial report indicated that, *inter alia*, key witness Sky Flanders (Mr. Harless' girl friend) was aware of and had seen Mr. Harless in multiple street fights and brawls. LONGANBACH knew that such information would support GENZLER's claim of self-defense.

43. LONGANBACH ordered O'BRIEN to destroy the report and redraft it deleting any reference to Mr. Harless' prior physical conflicts or any other potentially exculpatory evidence/ information.

44. O'BRIEN destroyed the original report and rewrote it without reference to Mr. Harless' prior street fights or Ms. Flanders' knowledge of Mr. Harless being involved in brawls.

45. In order for the revised report to go undetected, LONGANBACH and O'BRIEN conspired to hide evidence and hide the truth by tampering with witnesses and suborning perjury. They used their investigatory and administrative functions to set about a plan to keep investigatory information, evidence and documents, to which GENZLER's attorneys were entitled, from GENZLER's attorneys. They refused to provide and otherwise delayed providing information to which GENZLER's attorneys were entitled. This gave them time to tamper with witnesses and change their testimony before the preliminary hearing which took place on or about May 23, 1996.

46. The two lead witnesses for the prosecution were Scott Davis and Sky Flanders, the victim's girlfriend. Both participated in taped interviews with police on or about April 18, 1996, more than one month before the preliminary hearing.

47. Transcripts of both interviews, as well as numerous other witness statements which were in the possession of LONGANBACH and O'BRIEN, were kept from GENZLER's counsel until after the preliminary hearing. Thus, GENZLER's attorneys did not have the benefit of the statements when the witnesses testified, and therefore could not cross-examine the witnesses on the contradictions between their testimony and what was contained in the previously recorded statements.

48. Still further, when the tapes were eventually disclosed, the tape related to Scott Davis had been tampered with.

49. Specifically, Scott Davis gave a recorded statement to homicide detective Jackson. Detective Jackson recorded the entire statement and turned the tapes over to the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE. When GENZLER's attorneys sought a copy of Scott Davis' critical initial statement, side "A" of the tape mysteriously came up blank. LONGANBACH and/or O'BRIEN were in possession of the tape since shortly after it was created - and now the first half of it was missing.

50. Sky Flanders also gave a taped statement to police investigators on or about April 18, 1996. During that interview, Ms. Flanders describes the "fight" much differently than she did at later dates. In fact, Ms. Flanders admits on tape (the first time she discussed the incident) that Dusty Harless was "on top" of GENZLER during the altercation; a fact which supported GENZLER's claim of self defense and a fact which was deleted from O'BRIEN's report.

51. LONGANBACH and O'BRIEN knew that information from Ms. Flanders which supported GENZLER's self-defense claim had been deleted from the investigative report and that GENZLER's attorneys had thus far been deprived of the taped interviews. They then suborned perjury. Specifically, prior to the preliminary hearing, LONGANBACH and O'BRIEN met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past.

52. After meeting with LONGANBACH and O'BRIEN, Ms. Flanders changed her testimony related to what she saw during the altercation. Since GENZLER's attorneys did not have access to the taped statement and therefore were without benefit of its contents, they were unable to cross-examine Ms. Flanders on her changed testimony or the reasons for the change.

53. Ms. Flanders had now perjured herself and was therefore committed to LONGANBACH's plan to obtain a murder conviction in the case regardless of the methods or means by which the conviction was obtained.

54. As indicated above, Sky Flanders was also told to testify falsely about having actually seen Mr. Harless in prior street or bar fights and about her knowledge of his being in other fights/brawls.

55. LONGANBACH and O'BRIEN knew that Ms. Flanders' testimony as to her knowledge of past aggressive conduct by Dusty Harless would be critical to gaining the conviction that they sought. During the investigation, they conveyed this in no uncertain terms to Ms. Flanders. They then put her on the stand, repeatedly, and allowed her to perjure herself. Her testimony was case determinative. It was also thoroughly dishonest.

56. Prior to the preliminary hearing in the case, it became apparent to GENZLER's attorneys that key discovery items which were in the possession of the prosecution's investigatory team were missing from the materials provided to them. These materials were crucial to GENZLER's defense. Taken together, there was a massive amount of documents, evidence and material which had been hidden. GENZLER's attorney, Gerald Blank, prepared and presented a motion for a continuance of the preliminary hearing. The motion was heard on May 21, 1996, before the Honorable Adrienne Orfield, Judge Presiding. At the hearing, LONGANBACH stated that he was not aware of the existence of, *inter alia*, the percipient witnesses' taped statements, some of which were more than one month old at the

time and which the prosecution had been using during their investigation. The materials were then sporadically and grudgingly provided to GENZLER's attorneys. The materials were provided either on the eve of the preliminary hearing or after it had taken place. The timing of the disclosures prevented GENZLER's attorneys from utilizing the materials at the preliminary hearing.

57. Although the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and law enforcement officials had possession of and access to this information well before the preliminary examination, and used these materials during their investigations, they used the investigative and administrative processes to hide, secrete and otherwise prevent GENZLER's attorneys from getting access to the materials or using them in the criminal defense investigation and/or defense of the case.

58. The above conduct, in essence, prevented GENZLER's attorneys from properly examining witnesses during the preliminary hearing or preparing the case as quickly and fully as it should have been. Thus, the prosecution used its investigatory and administrative powers to deprive GENZLER of his constitutional rights to a fair trial.

59. LONGANBACH and O'BRIEN's misconduct did not stop there. On August 22, 1996, at an evidentiary hearing held before the Honorable Joan P. Weber, LONGANBACH granted prosecution witness, Sheri Logel, immunity in exchange for testimony favorable to the prosecution. This grant of immunity included immunity from perjury and *not just from past acts of perjury, but was intended to cover future acts of lying on the stand at the trial of plaintiff.* In essence, LONGANBACH gave Ms. Logel a "get out of jail free card" for lying on the stand. This was done with the knowledge of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE.

60. Ms. Logel then went on to perjure herself at LONGANBACH's direction. Specifically, she testified that she had given to Mr. Blank the knife which allegedly had been used in the altercation wherein Mr. Harless was killed. She further testified for LONGANBACH that Mr. Blank then wiped the knife clean and instructed her to return it to the car from where it was initially taken by her.

61. Mr. Blank later raised the grant of immunity with the trial judge, Judge Kennedy, who promptly disallowed and/or revoked the grant of immunity as to perjury, in his court.

62. Later, having her perjury immunity removed, Ms. Logel admitted that she had lied under oath about her dealings with Gerald Blank, including her testimony related to delivering evidence,

including that knife, to Gerald Blank's office.

63. Ms. Logel lied because she was threatened by LONGANBACH. Specifically, she stated that after she found the knife in her trunk she told LONGANBACH. LONGANBACH responded by threatening that if she didn't testify that Mr. Blank gave her the knife and instructed her on what to do with it, he would send her to jail and take away her children.

64. The false testimony, caused by a combination of threats and a grant of immunity, was committed as part of an investigatory aspect in the case. It violated GENZLER's constitutional rights to a fair trial and interfered with GENZLER's relationship with his chosen retained counsel. In fact, the relationship was completely severed. While Ms. Logel did not testify at trial, her lies were the key to a ruling by Judge Kennedy which recused Mr. Blank from the case. Without her false testimony there would have been no basis for the ruling to recuse GENZLER's counsel.

65. LONGANBACH used Ms. Logel's lies when he represented to Judge Kennedy that he intended on calling both Ms. Logel and Mr. Blank as witnesses in the case. In fact, LONGANBACH bluntly assured Judge Kennedy that he would call both as trial witnesses. Judge Kennedy told LONGANBACH he did not want to be "sandbagged" on the issue; however, based on Ms. Logel's perjured testimony and LONGANBACH's representations, Judge Kennedy recused Mr. Blank and thereby removed GENZLER's attorney of choice.

66. Neither Mr. Blank nor Ms. Logel were called as trial witnesses by LONGANBACH. It was nothing but an attempt to use suborned perjury to influence the outcome of the case which LONGANBACH had promised his supervisors he would win.

67. LONGANBACH was excited by the recusal ploy he used. It became one of his favorite tactics. He tried the same tactic in other cases and on other attorneys. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE was aware of what he was doing and how he was doing it, but continued to condone and ratify his conduct, because it worked.

68. Prior to LONGANBACH's motion to recuse Mr. Blank, and as part of the investigation of the incident, Sky Flanders informed O'BRIEN and LONGANBACH of at least two instances where she witnessed Dusty Harless in "street fights " and told LONGANBACH of at least one other incident wherein she heard that Mr. Harless "launched" several males who had surrounded him in a physical

altercation at a bar. Not only did the evidence support the conclusion that this critical defense evidence was removed from O'BRIEN's first version of the report, at LONGANBACH's direction, but Ms. Flanders was told not to mention these fights on the witness stand. Ms. Flanders was also told that any mention of these fights would diminish the likelihood of a conviction. Accordingly, she testified in the 1996 trial that she had never witnessed Dusty Harless in any "street fights."

69. Sky Flanders testified at the June 19, 2000 dismissal hearing. During that hearing she provided far greater detail of the incident than she provided to Officer McElfresh and Detective Duran in 1996. The testimony at the June 19, 2000 dismissal hearing, clearly showed that she committed perjury after she met with LONGANBACH and O'BRIEN. She provided vivid detail of the incident at Cable and Voltaire to McElfresh, Duran, and friends and family members within hours after the incident however, following her meetings with LONGANBACH and O'BRIEN, she was suddenly "secure" in her belief that she had not seen the incident or any of the events which supported GENZLER'S claim of self-defense.

70. Ms. Flanders later stated that she knew when she left the first meeting with LONGANBACH and O'BRIEN that it would be better for the case if she didn't see the details or testify to them.

71. A four (4) page San Diego Police Department ("SDPD") Crime/Incident Report in SDPD Case Number 93-063750, relating to an alleged incident between GENZLER (and others) and John M. Belsan, a prosecution witness in GENZLER's 1996 trial, was also hidden by LONGANBACH and/or his investigators at the direction of LONGANBACH. The incident allegedly occurred on July 18, 1993, when Mr. Belsan was working as a bouncer at a Pacific Beach bar named "Mick's" and where GENZLER and others were patrons. An altercation occurred. GENZLER was neither arrested by the SDPD nor prosecuted with respect to this incident.

72. During the 1996 proceedings, LONGANBACH had Mr. Belsan testify that this incident was a prior violent act committed by GENZLER. However, the aforementioned police report was never disclosed to the defense in connection with GENZLER's 1996 trial proceedings.

73. Years later, when it eventually was turned over, the police report showed that not only did Mr. Belsan's testimony on the description of the incident and his injuries vary from those he gave

the police the night of this incident and those which were contained in the police report, but even his physical description of GENZLER was different. Because the report was hidden, GENZLER's attorneys were not only unable to impeach Mr. Belsan with his prior inconsistent statements, but they were also unable to ascertain the identities of the responding officers or call them to the stand to impeach Mr. Belsan. Thus, the only evidence available to impeach Mr. Belsan's testimony, was that of GENZLER.

74. Still further, later in the trial, the defense tried to subpoena the police report from the SDPD. In response, the defense received a Certification of No Records. As such, LONGANBACH and O'BRIEN used their positions to remove the only available copies of the report related to the "Belsan"incident and thereby further prejudice GENZLER and prevent him from obtaining a fair trial.

75. LONGANBACH also used the "Belsan" incident to add another spring board to his closing argument. Mr. Belsan testified he was "hit across the shoulders with something, a pipe, stick, board." When he turned around, he said he was facing the GENZLER brothers. The SDPD Crime/ Incident Report patently controverted this allegation in that it indicated that the only weapon listed there is "hands and feet." Nevertheless, LONGANBACH argued in his closing argument that Belsan's testimony was proof that GENZLER was the "master of the sneak attack . . . I think we also see a pattern. The defendant is the master of the surprise attack, the sneak attack. That's what he did with John Belsan."

76. To compound this array of misconduct both in and out of the courtroom, LONGANBACH then argued to the jury the relevance and importance of the "Belsan" incident by referring to it as evidence of "other crimes," by GENZLER which "you [the jury] can use this evidence of other crimes in evaluating the credibility of self-defense."

77. In addition, LONGANBACH argued how GENZLER kicked Mr. Belsan in the face. He made this allegation knowing that his investigation tactics had discovered the medical records of Mr. Belsan that contained no indication that such a kick ever occurred. These records could have been used to impeach Mr. Belsan's credibility. Specifically, on December 2, 1996, Nancy Cervi, Mission Bay Hospital custodian of records, appeared in court in response to a defense subpoena. She stated she did not have the medical records related to Mr. Belsan's treatment from the night at issue but had already turned them over to O'BRIEN. She had given them to O'BRIEN on August, 26, 1996, almost three (3)

months prior to the trial date whereupon LONGANBACH called Mr. Belsan to the stand. Those records were withheld from GENZLER's counsel during the trial.

78. In short, LONGANBACH used his investigatory and administrative powers to frustrate and corrupt GENZLER's right to a fair trial, then used his position as trial attorney to capitalize on those illegal acts thus furthering the violations to GENZLER's constitutional rights.

79. LONGANBACH also attempted to influence other investigators to perjure themselves at the 1996 trial and alter reports related to the underlying incident with Mr. Harless. Specifically, LONGANBACH was aware of an issue related to blood stains on a shirt allegedly worn by GENZLER on the night of the incident. The DNA evidence was degraded. The cause of the degradation was apparently exposure to moisture. LONGANBACH wanted to argue that GENZLER washed the shirt himself, thus demonstrating his intent to cover up a crime. Accordingly, LONGANBACH contacted Sargent Martin, the officer who investigated the scene and who wrote the description of the area and weather conditions on the evening of the incident. LONGANBACH told him: "Just remember, rain is bad." The reason that "rain is bad" is because it would explain why the shirt was exposed to moisture.

80. Not surprisingly, LONGANBACH obtained the conviction he was after. On February 10, 1997, GENZLER was sentenced for second degree murder. He was given 20 years to life. He was 26 years old and faced spending the rest of his life in prison.

81. After securing GENZLER's conviction, LONGANBACH was promoted to the position of Chief of the Fraud Division for the District Attorney's Office. This promotion constitutes the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's "official" ratification of LONGANBACH's unethical and illegal conduct. In essence, they promoted him for violating GENZLER's constitutional rights and getting away with it.

82. While in his elevated position, LONGANBACH was frequently observed engaging in conduct which was unethical and illegal which included overt attempts to further violate the rights of persons whom he was prosecuting. However, none of this conduct ran afoul of the administrative goals of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE as long as he was getting the convictions. In fact, it was only after allegations that LONGANBACH illegal used of county personnel and equipment to work on his personal affairs and financial matters that anyone became critical of his

behavior. In essence, it was acceptable that LONGANBACH was violating the constitutional rights of citizens but unacceptable if he stealing time or resources from the County.

83. The lengths to which LONGANBACH would go to gain an unfair and unethical advantage were well known prior to and during the retrial phase. As a specific example, LONGANBACH, and those under his direction, would engage in investigatory and administrative misconduct such as hiding approximately 100 pages of discovery relevant to a case being tried, among 18,000 pages of discovery in the case. The defense had requested all documents. LONGANBACH directed those under his supervision to devise a plan to make discovery extremely difficult for the defense attorneys to manage or find the relevant material. They did so by collating the 100 pages of relevant discovery into the 18,000 thousand pages of other documents with the specific purpose of making the relevant discovery hard, if even possible, to find.

84. By way of further example, at LONGANBACH's direction, his investigators and/or administrative staff altered evidence by changing numbers on documents and intentionally made light copies of discovery on the office copier so that they could not be read.

85. O'BRIEN was seen and known to have done the same things.

86. Still further, LONGANBACH was known to have obtained confidential information related to criminal defenses and not only failed to return the documents, but altered his prosecution strategy so as to make use of the information which he illegally maintained.

87. SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE was aware of these incidents and failed to do anything about them. Rather, they allowed LONGANBACH to continue engaging in such tactics.

88. Because of the administrative policies permitting, condoning and fostering the above referenced conduct, LONGANBACH and O'BRIEN were free to and did conspire and acted so as to change the investigative report related to Sky Flanders, manufacture evidence and suborned perjury. They deleted references to statements that described Harless as a fighter who had been in multiple street fights. Later, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE became aware that the information was removed from the reports provided to GENZLER's attorneys and that LONGANBACH and O'BRIEN had coerced Sky Flanders into perjuring herself, the SAN DIEGO COUNTY DISTRICT

ATTORNEY'S OFFICE either failed to act or acted inappropriately, thereby condoning the misconduct. Specifically, even after the wrongful conduct of LONGANBACH and O'BRIEN were known, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE continued to make excuses for the acts and hide the truth.

**C. The San Diego County District Attorney's Office Tried to Protect Longanbach and Cover up the Misconduct.**

89. LONGANBACH's unethical conduct and obvious willingness to do anything to win was noted by professionals outside the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and those within the criminal justice system. These complaints were received before GENZLER's case was remanded on appeal. Therefore, before the specific allegations of misconduct were made in the instant matter, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE knew of LONGANBACH's inappropriate behavior and willingness to lie, cheat and engage in illegal behavior.

90. In a letter to District Attorney Paul Pfingst dated November 30, 1998, economist Arthur Brodshatzer wrote about his recent experience dealing with LONGANBACH in an unrelated case on which LONGANBACH had asked him to consult: "... frankly I was appalled at his [LONGANBACH's] total dishonesty...but he just made me want to retch. I think you should do something about this man. He is a danger to your office and to the likelihood of someone getting a fair trial. Obviously, he can lie with ease."

91. Nothing was done.

92. In the early spring of 1999, the GENZLER case was remanded for retrial and assigned to DDA Rebecca Blair for prosecution. As she began working on the case, she discovered facts which clearly violated her code of ethics and those purportedly espoused and adopted by the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE.

93. In April 1999, when LONGANBACH's misconduct was initially discovered by DDA Blair during her conversation with O'BRIEN, she had a meeting with top level members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE. During the meeting, she was not only discouraged from immediately presenting the information to GENZLER's defense attorneys, but was actively prevented from doing so. Still further, she was discouraged from pursuing her inquiry into any

prosecutorial misconduct.

94. In addition, after the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE top level supervisors and personnel learned that there was no way that they could keep the misconduct secret, they attempted to not only minimize the events, but took steps to protect LONGANBACH from internal investigations that would readily and easily prove that he had corrupted the investigation, mishandled the case, and engaged in illegal conduct in the preparation of the case both in its investigative and trial phases. Specifically, *before* reluctantly contacting internal affairs investigators so that they could initiate an investigation into LONGANBACH's misconduct, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE called LONGANBACH at home and warned him that they were being forced to initiate an investigation and thereby gave him an opportunity to destroy evidence, documents and materials related to what he had done.

95. In essence, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE used its administrative powers to intentionally thwart the efforts and effectiveness of an investigation into investigatory, administrative and prosecutorial misconduct by advising the target of the investigation that he needed to be prepared. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE intentionally gave LONGANBACH the opportunity to get ready and prepared to be investigated. Such conduct constitutes ratification of the underlying acts and conspiracy to cover up the violations to GENZLER's constitutional rights.

96. As noted, after the Court of Appeals remanded the case for new trial and LONGANBACH tried to get assigned as the trial deputy in the retrial, LONGANBACH tried to exert pressure on DDA Blair and control the case from the outside. He had meetings with her wherein he tried to steer the case and tell her how she needed to handle the prosecution. These efforts and contacts were nothing more than an attempt to cover up his wrongful conduct in the 1996 investigation and trial.

97. DDA Blair told LONGANBACH that she did not want him involved at all.

98. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE knew LONGANBACH was engaged in this conduct. They did nothing to stop it, rather they also pressured DDA Blair to not pursue LONGANBACH's misconduct as aggressively as she intended.

99. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE also withheld evidence

from GENZLER's attorneys. As set forth above, as part of the case's initial investigation, LONGANBACH and O'BRIEN changed and hid reports, including that which was related to Mr. Belsan's felony arrest. Although the reports were requested, LONGANBACH never produced them. Later, after the case's remand, GENZLER's attorneys again requested that the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE produce the reports. In fact, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE was ordered by the court to produce them. However, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE failed to do so. The reports were not provided to GENZLER's attorneys until October 15, 1999, after the Attorney General's office took over the case. The cover memorandum makes it clear that the report was in the possession of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and turned over to the Attorney General after the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE finally recused itself from the retrial.

100. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE had materials which were exculpatory. The court ordered that these materials be produced. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE failed to produce the evidence related to the misconduct despite the fact that they were initially the agency conducting the investigation. Such a failure on the part of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE constitutes participation in a cover up of the wrongful acts of LONGANBACH and O'BRIEN. In fact, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's failure to wholly and promptly comply with all requests and discovery orders in the second trial was nothing more than an attempt to reconvict GENZLER of second degree murder so that the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE could later take the position that there were no adverse consequences to LONGANBACH's and O'BRIEN's misconduct.

101. On June 22, 1999, a hearing was held before Superior Court Judge Shore. The court ordered, *inter alia*, that the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE was to not destroy any additional records related to the prosecution of plaintiff.

102. Over the following weeks and months, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE ignored the court's order and continued destroying notes, reports and other documentary evidence sought by defense counsel.

103. During the investigation of the allegation of misconduct related to the GENZLER case,

the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE was aware that O'BRIEN was lying about what he did and did not do related to deleting material from reports and helping LONGANBACH get witnesses to change their testimony.

104. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE also knew that, *inter alia*, O'BRIEN, at the prompting of LONGANBACH, intentionally deleted from his report information which the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE knew that its investigators, and O'BRIEN specifically, routinely included in reports. Knowing that the information had been removed, the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE continued to protect O'BRIEN and LONGANBACH by not providing GENZLER's attorneys access to the requested information.

105. The SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE's also permitted O'BRIEN's report related to his initial interview with Sky Flanders to disappear and/or be deleted.

106. After it became known in the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE that DDA Blair was preparing evidence and participating in an investigation related to prosecutorial misconduct and later that she would be testifying honestly about the prosecutorial misconduct that her office had engaged in, she was ostracized by top level supervisors with the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE and pressured to change her testimony about what she was told by O'BRIEN about the suborning of perjury. Still further, at the direction of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, she was portrayed in open court as being incompetent, histrionic and inexperienced.

107. DDA Blair was not the only DDA who went to senior members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE with knowledge of LONGANBACH's misconduct and unethical behavior. Like Blair, they too suffered retaliation.

108. In August 1999, once it was finally decided that the matter was to be turned over to the Attorney General's office, LONGANBACH was told by senior members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE of the imminent change. LONGANBACH was seen shortly thereafter, early in the morning well before he usually entered the office and before anyone else usually got to the office, going through files and gathering materials from his office.

109. At hearings related to the retrial, including dismissal hearings and evidentiary hearings,

senior members of the SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE were seen holding closed door meetings with LONGANBACH and O'BRIEN and were also heard telling LONGANBACH that he had "to keep it together."

110. All of the above acts were administrative functions which were being used by defendants, and each of them, in an attempt to further violate GENZLER's constitutional rights.

**FIRST CAUSE OF ACTION**

**(Conspiracy to Commit Violation of the Civil Rights 42 U.S.C. 1983 - Against All Defendants)**

111. Plaintiff realleges those allegations contained in the above paragraphs and incorporates them into this cause of action as the set forth fully herein.

112. Defendants, and each of them, as alleged above, entered into a conspiracy to violate the civil and constitutional rights of plaintiff, including violations of the first, fourth, fifth, eighth, thirteenth and fourteenth amendments.

113. As alleged in the foregoing paragraphs, the defendants, and each of them, both individually and by and through their agents and employees, acting under color of the State Law and/or statutes, ordinances, regulations, custom and usage, subjected, and/or caused to be subjected, plaintiff to violations of those rights, privileges and immunities secured by the Constitution and the laws of the United States and of the state of California.

114. As a direct and proximate result of the tortious acts of defendants, and each of them, plaintiff has suffered actual special and general damages, the nature and amount of which will be shown according to proof at the time of trial.

115. The defendants, and each of them, engaged in conduct and committed the acts complained of herein with the intent to harm the plaintiff. Said acts were done maliciously and oppressively. Plaintiff is therefore entitled to exemplary and punitive damages to be shown according to proof at the time of trial.

**SECOND CAUSE OF ACTION**

**(Violation of Civil Rights 42 U.S.C. Section 1983 - Against All Defendants)**

116. As alleged in the foregoing paragraphs, the defendants, and each of them, both individually and by and through their agents and employees, acting under color of statute, ordinance,

regulations, custom and practices, subjected and/or caused to be subjected, plaintiff to violations of his civil rights, privileges and immunities, which are secured by the Constitution and laws of the United States and the of the State of California including violations of the first, fourth, fifth, eighth, thirteenth and fourteenth amendments.

117. As a direct and proximate result of the tortious acts of defendants, and each of them, plaintiff has suffered special and general damages, the exact nature and amount of which will be shown according to proof at the time trial.

118. The defendants, and each of them, engaging in conduct in committing the acts complained of herein which were malicious and oppressive and done with the intent to harm plaintiff. Plaintiff is therefore entitled to exemplary and punitive damages which will be shown according to proof that the time of trial.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows:

As to the First Cause of Action:

1. For special damages according to proof;
2. For general damages according to proof;
3. For prejudgment interest according to law;
4. For attorney fees pursuant to code;
5. For costs of this suit incurred herein; and
6. For such other and further relief as the Court deems just and proper.

As to the Second Cause of Action:

1. For special damages according to proof;
2. For general damages according to proof;
3. For prejudgment interest according to law;
4. For attorney fees pursuant to code;

/////

/////

/////

5. For costs of this suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

Dated: August 10, 2001

HOSEY & BAHRAMBEYGUI

By: ______________________
Patrick L. Hosey
Attorneys for Plaintiff
DAVID GENZLER

ORIGINAL

(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS** DAVID GENZLER

**DEFENDANTS** PETER LONGANBACH, an individual; JEFFREY O'BRIEN, an individual; COUNTY OF SAN DIEGO, a governmental entity; SAN DIEGO COUNTY DISTRICT ATTORNEY'S OFFICE, a governmental entity; and DOES 1-100

01 AUG 10 PM 2:27

DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES)** San Diego

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY)** San Diego

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

'01 CV 1462 K (JAH)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Patrick L. Hosey, Esq. (164104)
Hosey & Bahrambeygui
550 West C Street, Suite 2050
San Diego, CA 92101; 619-231-0500

**ATTORNEYS (IF KNOWN)** Unknown

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

42 USC 1983. cv-rt Defendants violated plaintiff's civil and constitutional rights.

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment &Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veterans Benefits
☐ 160 Stockholders Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Tort to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury-Medical Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☒ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prisoner Conditions

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (13958)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reappointment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities Exchange
☐ 875 Customer Challenge 12 USC
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State
☐ 890 Other Statutory Actions

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 DEMAND $ 5,500,000.00 Check YES only if demanded in complaint: **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE Docket Number

DATE August 10, 2001 SIGNATURE OF ATTORNEY OF RECORD [signature]

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

74025 #150