















AXR    7/30/02    10:02

3:01-CV-01462   GENZLER V. LONGANBACH

*55*

*OPPM.*

1  **HOSEY & BAHRAMBEYGUI**
   Patrick L. Hosey, Esq. (Bar No. 164104)
2  Sherry S. Bahrambeygui, Esq. (Bar No. 166330)
   550 West C Street, Suite 2050
3  San Diego, CA 92101
   Telephone: (619) 231-0500
4  Facsimile: (619) 238-1097

5  Attorneys for Plaintiff
   DAVID GENZLER

**ORIGINAL**
**FILED**

JUL 2 9 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

6

7

8

9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

10

11  DAVID GENZLER,                                    )  Case No. 01 CV 1462 K (RBB)
                                                      )
12          Plaintiff,                                )  Date:  August 12, 2002
                                                      )  Time:  11:00 a.m.
13     v.                                             )  Dept:  16 - Courtroom of the Honorable Judith
                                                      )           N. Keep
14  PETER LONGANBACH, an individual;                  )  Trial Date:    None
    JEFFREY O'BRIEN,  an individual, GREGORY          )
15  THOMPSON, an individual; JAMES PIPPEN,            )  **[NO ORAL ARGUMENT]**
    an individual; PAUL PFINGST, an individual;       )
16  COUNTY OF SAN DIEGO, a governmental               )
    entity; SAN DIEGO COUNTY DISTRICT                 )
17  ATTORNEY'S OFFICE, a governmental entity;         )
    and DOES 1 through 100, inclusive,                )
18                                                    )
            Defendants.                               )
19                                                    )

20

21          **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**

22            **OPPOSITION TO DEFENDANT PETER LONGANBACH'S**

23                      **MOTION FOR SUMMARY JUDGMENT**

24

25

26

27

28

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     ORGANIZATION OF OPPOSITION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.    STANDARD FOR DISMISSAL UNDER RULE 56(c) . . . . . . . . . . . . . . . . . . . . . . . . .   2

IV.     ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

        A.    A Triable Issue of Material Fact Exists as to the Acts Committed by Longanbach  .   4

        B.    Longanbach is Not Entitled to Prosecutorial Immunity  . . . . . . . . . . . . . . . . . . .  10

              1.    Longanbach has not met his Burden of Showing that Subornation of Perjury,
                    Manufacturing Evidence and Tampering With Evidence Entitles Him to
                    Absolute Immunity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

              2.    Presentation of False Testimony at Trial  . . . . . . . . . . . . . . . . . . . . . . . . .  15

        C.    Longanbach is not Entitled to Prosecutorial Immunity for Post-Conviction
              Misconduct  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        D.    No Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

              1.    Longanbach Deprived Genzler of Actual Constitutional Rights  . . . . . . . .  17

V.      CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

Alcocer v. Superior Court (1988) 206 Cal.App. 3d 951 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Anderson v. Liberty Lobby, Inc., (1986) 477 U.S. 242, 250, 106 S.Ct. 2505, 2512 . . . . . . . . . . . 2

Barbera v. Smith (2nd Cir. 1987) 836 F.2d 96, 99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Brady v. Maryland (1963) 373 U.S. 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Buckley v. Fitzsimmons (1993) 509 U.S. at 269, 274 . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 13, 15

Burns v. Reed (1991) 500 U.S. 478, 484-85, 111 S.Ct. 1934, 1938-39 . . . . . . . . . . . . . . 10, 11, 12

Calderone v. United States (6th Cir. 1986) 799 F.2d 254, 259 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Celotex Corp v. Catrett, (1986) 477 U.S. 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Deveraux v. Abbey (9th Cir. 2001) 263 F.3d 1070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

Dimartini v. Ferrin (9th Cir. 1989) 889 F.2d 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Eastman Kodak Co. v. Image Technical Services, Inc. (1992) 504 U.S. 451, 456 . . . . . . . . . . . . . 3

Farmland Industries, Inc. v. Grain Board of Iraq (DC Cir. 1990) 904 F.2d 732, 736, fn. 7 . . . . . . . 2

Garrett v. San Francisco (9th Cir. 1987) 818 F.2d 1515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Harlow v. Fitzgerald (1982) 457 U.S. at 800, 818, 102 S.Ct. 2727, 2738 . . . . . . . . . . . . . . . . . . 16

Hobbs v. Municipal Court (1991) 233 Cal. App. 3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Houston v. Partee (1992) 978 F.2d 362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Imbler v. Pachtman (1976) 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed. 2d 128 . . . . . . . . . . . . 11, 12, 14

In re Martin (1987) 44 Cal. 3d 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kalina v. Fletcher (1997) 522 U.S. 118, 130, 118 S.Ct. 502, 509 . . . . . . . . . . . . . . . . . . . . . . . . 13

Landrigan v. City of Warwick (1st Cir. 1980) 628 F.2d 736, 744 . . . . . . . . . . . . . . . . . . . . . . . . 15

Maxwell v. Superior Court (1982) 30 Cal. 3d 606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Miller v. Pate (1967) 386 U.S. 1, 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Milstein v. Cooley (9th Cir., July 21, 2001) 257 F.3d 1004 . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

Napue v. Illinois (1959) 360 U.S. 264 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

People v. Boyd (1990) 222 Cal. App. 3d 1541,1568-69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

People v. Burrows (1990) 220 Cal. App. 3d 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1   People v. Collie (1981) 30 Cal. App. 3d 43, 54 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2   People v. Courts (1985) 37 Cal. 3d 77 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3   People v. Filson (1994) 22 Cal. App. 4th 1841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4   People v. Jackson (1991) 235 Cal. App. 3d 1670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5   People v. Sharparnis (1983) 147 Cal. App. 3d 190 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6   Pyle v. Kansas (1942) 317 U.S. 213, 216 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

7   Stearns Airport Equip Co. v. FMC Corp. (5th Cir. 1999) 170 F.3d 518, 534 . . . . . . . . . . . . . . . . . 3

8   Triton Energy Corp. v. Square D Co. (9th Cir. 1995) 68 F.3d 1216, 1222 . . . . . . . . . . . . . . . . . . . 3

9   Waldridge v. American Hoechst Corp. (7th Cir. 1994) 24 F.2d 918, 921 . . . . . . . . . . . . . . . . . . . . 2

10  Wardius v. Oregon (1973) 412 U.S. 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11  Weir v. Anaconda Co. (10th Cir. 1985) 773 F.2d 1073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

12  Wilson v. Layne (1999) 526 U.S. 603, 609, 119 S.Ct. 1692 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

13  Ybarra v. Reno Thunderbird Mobile Home Village (9th Cir. 1984) 723 F.2d 675, 678 . . . . . . . . . 11

14  Zahrey v. Coffey (2nd Cir. 2000) 221 F.3d 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 19, 20

15                                              **FEDERAL RULES**

16  Federal Rule of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

17  Federal Rule of Civil Procedure 50(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18  Penal Code § 1054.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19  Penal Code § 1054.1(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

20

21

22

23

24

25

26

27

28                                              -iii-

1    **COMES NOW PLAINTIFF, DAVID GENZLER**, by and through his attorney of record,

2    Patrick L. Hosey, of Hosey & Bahrambeygui, and hereby submits this Opposition to Motion for

3    Summary Judgment and/or Summary Adjudication filed on behalf of defendant Peter Longanbach.

4                                                        **I.**

5                                              **INTRODUCTION**

6    Defendant Peter Longanbach, begins his Motion for Summary Judgment by describing Mr.

7    Genzler as a being "twice convicted of killing another human being, [who] seeks to cast blame for his

8    incarceration on everyone but himself." Mr. Longanbach still does not get it. This is the very attitude

9    which drove him to violate David Genzler's constitutional rights to begin with. Genzler had a right to

10   a fair trial. Indeed, this concept only has value to those who have been charged with a crime. David

11   Genzler was constitutional entitled to a trial based on the evidence that existed against him-not the

12   evidence that Longanbach wished existed, not the evidence that he manufactured, not the perjured

13   testimony that he suborned, but the actual evidence that existed.

14   Longanbach, a convicted felon who shamefully disgraced the trust he held, the San Diego County

15   Bar Association and the majority of prosecuting attorneys in the State of California, brings the instant

16   Motion for Summary Judgment which can be summed up as follows: *"I didn't do it; and even if I did,*

17   *you can't prove it. Even if you can, it doesn't matter because I can hide behind a prosecutor's absolute*

18   *immunity.*

19   Longanbach is wrong on all counts. He committed the illegal and unethical acts alleged in the

20   First Amended Complaint; plaintiff has the evidence establishing triable issues of material facts as to

21   those acts; and because he engaged in those acts, he is entitled to neither absolute nor qualified

22   immunity.

23   Plaintiff opposes the motion the following grounds:

24   1.      A triable issue of material fact exists as to the acts committed by Longanbach;

25   2.      Longanbach has not met his burden of showing entitlement to absolute immunity;  and

26   3.      That Longanbach's wrongful acts do not entitle him to qualified immunity.

27   / / /

28   / / /

---

1                                                              01 cv 1462 K (RBB)

## II.

## ORGANIZATION OF OPPOSITION

The evidence supporting this opposition is voluminous.  For organizational purposes, plaintiff has provided a Separate Statement of Disputed and Undisputed Facts.  The statement is in chart form. The factual allegation and accompanying reference to the First Amended Complaint are followed by a description of the evidence and the source of that evidence.

## III.

## STANDARD FOR DISMISSAL UNDER RULE 56(c)

A motion for summary judgment provides a procedure for terminating without trial only those actions in which "there is no genuine issue as to any material fact and …the moving party is entitled to judgment as a matter of law.  FRCP 56(c).  Summary judgment is only proper where there is no genuine issue of material fact.  FRCP 56(c).  The materiality of any fact is determined by the pleadings.  The inquiry is the same as that used for a motion for judgment as a matter of law under FRCP 50(a ).  That inquiry is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc. (1986) 477 U.S. 242, 250, 106 S.Ct. 2505, 2512.    The interpretation and application of Rule 56 is a matter of federal law.  Although the characterization of issues and the determination of materiality and of the sufficiency of the factual showing are often intertwined with questions of state law, whether a trial is necessary is a matter of federal law.  Farmland Industries, Inc. v. Grain Board of Iraq (DC Cir. 1990) 904 F.2d 732, 736, fn. 7.  "It is the substantive law's identification of what facts are critical and what facts are irrelevant that governs."  Anderson, supra, at 248.  The federal judge must determine whether a reasonable jury could return a favorable verdict for the nonmoving party.  Id. At 250.

The nonmoving party "need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact.  Waldridge v. American Hoechst Corp. (7th Cir. 1994) 24 F.2d 918, 921.  The opposition may consist of declarations, admissions, evidence obtained through discovery, and matters judicially noticed.  FRCP 56 ( c); Celotex Corp. v. Catrett (1986) 477 U.S. 317.

"Rule 56 requires the moving party to show not only the absence of a disputed issue of fact but

---

1    also that he is entitled to judgment as a matter of law…(T)herefore, the court must consider the burden

2    of proof on the issue and where it will rest at trial…Where the moving party has the burden …his

3    showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for

4    the moving party." Calderone v. United States (6th Cir. 1986) 799 F.2d 254, 259.  While a showing of

5    an absence of evidence supporting an opponent's case may suffice, this method is only proper after

6    adequate opportunity for discovery so that no serious claim can be made that the losing party was

7    railroaded by a premature motion for summary judgment. Celotex, supra, at 326. The moving party must

8    identify the specific issue or issues on which it claims the opposing party has no supporting evidence

9    and demonstrate the absence of such evidence.    The test is whether the opposing party "has come

10   forward with sufficient 'specific' facts from which to draw other reasonable inferences about other

11   material facts that are necessary elements of the (opposing party's) claim." Triton Energy Corp. v.

12   Square D Co. (9th Cir. 1995) 68 F.3d 1216, 1222.  Inferences drawn from the evidence must be viewed

13   in the light most favorable to the nonmoving party. Eastman Kodak Co. v Image Technical Services,

14   Inc. (1992) 504 U.S. 451, 456.

15       If  the motion is brought early in the litigation and the case involves complex facts requiring

16   additional discovery, and where material facts are within the exclusive knowledge of the moving party

17   .       and the opposing party cannot present by affidavit facts essential to justify the party's opposition,

18   the court may deny the motion for summary judgment or continue the hearing to allow additional

19   discovery. Garrett v. San Francisco (9th Cir. 1987) 818 F.2d 1515; Weir v. Anaconda Co. (10th Cir.1985)

20   773 F.2d 1073; Stearns Airport Equip. Co. v FMC Corp. (5th Cir. 1999) 170 F.3d 518, 534.

21       The type of evidence which the court should consider when determining the existence of a

22   material fact will depend on the type and timing of the motion.  In Dimartini v. Ferrin, (9th Cir. 1989)

23   889 F.2d 922, a government employee, prior to plaintiff engaging in any discovery, moved for summary

24   judgment on the basis of qualified immunity.   The court ruled that the evidentiary rules of the

25   admissibility of evidence in civil rights suits relating to affidavits in support of oppositions to motions

26   for summary judgment for immunity must be relaxed.

27           "In reviewing … summary judgment advanced on the grounds of qualified immunity we
             must accept as true the facts stated in the affidavits.  Schwartzman v. Venezuela, (9th
28           Cir. C 1988) 846 F.2d 1209, 1211  If the facts as alleged … violated clearly established

---

1    law, summary judgment was properly denied." *Id*.

2    Because the Supreme Court has barred discovery until after the trial judge can answer the
     legal question whether the alleged acts constitute a constitutional violation that was
3    clearly established at the time, a plaintiff may often have no way to defend against a
     summary judgment motion other than through his own affidavit. In order to survive the
4    motion, the plaintiff must set forth facts sufficient to raise the constitutional question.
     However, he cannot depose the percipient witnesses who could testify to those facts, and
5    he may not himself have directly observed all the critical events.

6    This dilemma requires some relaxation of the ordinary rules of admissibility in the case
     of affidavits used to oppose qualified immunity motions. For example, since plaintiffs
7    cannot compel testimony from others when opposing such motions, they must be allowed
     to rely on what those witnesses have told them, i.e. hearsay. Similarly, plaintiffs may not
8    be able to obtain documents in the possession of others, and may be compelled, instead,
     to set forth their understanding of the contents of those documents in their own affidavits.
9    Thus, the best evidence rule cannot always be strictly enforced. Also, a greater tolerance
     of speculation and inference must be afforded. ... [A] plaintiff must be permitted to set
10   forth his understanding of the facts whether or not his knowledge is a firsthand or meets
     all of the ordinary rules of evidence." DiMartini, *supra*, at 926-27.

11

12        Thus, when considering the evidence presented in opposition to the defendants' motion, this

13   court should liberally apply the admissibility standards.

14                                               **IV.**

15                                           **ARGUMENT**

16   **A.      A Triable Issue of Material Fact Exists as to the Acts Committed by Longanbach**

17        Longanbach asserts that plaintiff is "unable to provide any evidence whatsoever to support his

18   claims of wrongdoing." (Longanbach MSJ pg. 10/ 22-23). This is simply incorrect and is vigorously

19   disputed. As is set forth below, plaintiff has ample evidence creating a triable issue of material fact

20   related to Longanbach's wrongdoing.

21        During the initial investigation of the Genzler case, it became apparent that the incident giving

22   rise to the criminal charges against Genzler resulted from a chance meeting that escalated into a street

23   fight wherein Dusty Harless was unfortunately killed. (FAC ¶ 14, 17, 18, 19) Longanbach received the

24   initial summaries of the police detectives initial interviews which were conducted within the first 48

25   hours after Mr. Harless' death. Included in these materials were statements taken from witness Sky

26   Flanders wherein Flanders provides a detailed description of the events which she saw transpire on April

27   18, 1996, including that Harless as the aggressor, that she saw Harless "flip" Genzler , that she did saw

28   Harless have Genzler  on the ground and "wouldn't let him up." (DMF ¶ 15, Exh. 10 at 00525: 1, 12,

---

1  24) Over the next few days, Ms. Flanders repeated this description of 20 of her family and friends.
2  (DMF ¶ 16. Exh.11 at 100:25-101:13) In addition there were photographs and statements by Genzler
3  indicating that he and Mr. Harless had been exchanging punches. (DFM ¶ 18, Exh. 13, 14 (at 4:21) and
4  15) This evidence suggested that Genzler would claim self-defense.

5      Within days after Harless' death, O'Brien interview of Sky Flanders wherein he took notes.
6  (DMF ¶ 19)  He took notes during the interview.  (DMF ¶ 19 Exhibit 11 at 54:14-17; 177:28-178:3.)
7  Flanders told O'Brien that Mr. Harless had a history of violent physical confrontations, some of which
8  she personally witnessed.  (DMF 20, Exh. 12 at 100118) O'Brien drafted a report based on that
9  interview.  (DMF ¶ 19)  Longanbach ordered O'Brien to destroy the report and redraft it deleting any
10 reference to prior physical conflicts or any other potentially exculpatory evidence/information. (DMF
11 ¶ 20; Exh. 12 at 100118.)  O'Brien did as he was told, later stating that he works for Longanbach and
12 "my job is to do what he tells him to do." (DMF ¶ 21; Exh. 12 at 100118.)

13     Flanders then had a series of meeting with Longanbach and O'Brien. (DMF ¶ 21, 22, 28, Exh.
14 11, 16, 17, 18)  Flanders repeatedly told O'Brien and Longanbach that Harless knew how to fight; that
15 he had been in multiple street fights; that she had personally seen him involved in multiple fights; that
16 she had been told that he had been involved in multiple other violent confrontations; that he was known
17 as someone who never lost a fight; and that he was known as someone who would never back down in
18 a confrontation. (DMF ¶ 21, 28, 30, 36) Longanbach knew that Flanders' testimony would decrease his
19 ability to obtain the conviction he was after so he pressured Flanders into changing her testimony. (DMF
20 ¶ 22, 28, Exhibits 11, 12, 16, 17, 18) Longanbach and O'Brien the coerced Flanders into perjuring
21 herself by convincing her that she did not see the events of April 18, 1996, and repeatedly advising her
22 that if she testified consistently with her initial statement or truthfully about Harless' violent past, they
23 would not get the conviction they were after. (DMF ¶ 22, 28, 29, 30, Exh. 11)  As a result of Ms.
24 Flanders' meeting with Longanbach and O'Brien, Flanders became convinced that she needed to lie
25 about both Harless' violent past and what she saw on the night of the incident. (DMF ¶28-30, 34-36)
26 Following these meetings, she became convinced that she did not see Harless as the aggressor, that she
27 did not see Harless "flip" Genzler and that she did not see Harless having Genzler on the ground and
28 "wouldn't let him up". (DMF ¶ 22, 26, 28, 33) Still further, she was now convinced that if she testified

1    about Harless' prior fights it would jeopardize Longanbach's ability to get the conviction that he sought.

2    (DMF ¶ 33)

3        Flanders took the stand and lied about her knowledge of Harless' violent history, the times she

4    saw him fighting, the times she heard of him fighting, his reputation as a fighter, and her recollection

5    of the events of April 18, 1996.  (DMF ¶ 22, 35, 36)

6        Longanbach and O'Brien then either refused to provide or delayed providing exculpatory

7    evidence to which Genzler was entitled and began tampering with evidence and witnesses such that the

8    evidence against Genzler would be more conducive to his theories.  Since the preliminary hearing is the

9    first time witnesses usually testify in court, a defense attorney's ability to properly examine them on

10   material aspects of the case are critical.  (Exh. 24) Longanbach intentionally delayed the production of

11   evidence so as to prejudice Genzler's attorney's ability to prepare to examine witnesses at the

12   preliminary hearing.  (DMF ¶ 25)  He also coerced witnesses to embellish their version of events so as

13   to bolster his key arguments in order to have an effect  in terms of the degree of conviction that would

14   be obtained and the ultimate sentence to Genzler.  (DMF ¶ 53, 33)  For example, Longanbach attempted

15   to have Sargent Martin of the SDPD change his testimony related to whether it was raining on the

16   evening of April 18, 1996, because Longanbach wanted to say that Genzler had washed the blood from

17   his clothes and thus eliminate the inference that the rain caused the degradation of the DNA sample

18   taken from Genzler's clothes. (Exhibit 23 at  680:9-21; 685:15-26). Longanbach called Sargent Martin

19   before he took the stand and told him "Rain is bad."  Sargent Martin asked him what he meant by that,

20   to which Longanbach merely repeated, "Just remember, rain is bad." (DMF ¶ 53; Exhibit 22 at 1930:4-

21   1931:22.) Also, after meeting with Longanbach and O'Brien, key witness Scott Davis' placement of

22   Harless, Flanders and Genzler at the scene shifted radically (Exh. 30, 31) and Paul Ernst's recollection

23   of Genzler's statements at the scene became more dramatic. (DMF ¶ 33, Exhibits 25 through 29)

24       In addition, on April 18, 1996, witnesses Scott Davis and Sky Flanders, both gave taped

25   interviews to the police wherein they provided first hand accounts of what they saw during the

26   altercation.  (DMF¶ 23)  Transcripts of both interviews were in the possession of Longanbach and

27   O'Brien, who, despite requests, kept the tapes from Genzler's counsel until after the preliminary hearing.

28   (DMF ¶ 24-26, Exh. 19, 20, 24, 30) When the Davis tape was not turned on September 4, 1996, almost

five (5) months after it was created, it was discovered that side "A" of the tape was blank. (DMF ¶ 27; Exhibit 40)  When asked about the tape and its creation, homicide detective Jackson stated that he could not recall ever producing a tape of an interview that was blank on one side and  "[i]f I were taping an interview I'd either do my report right away with out the assistance of tape or review it to refresh.  I probably reviewed this." (Exhibits 41 and 42).  At the preliminary hearing, Scott Davis testified that he witnessed Detective Jackson press the record button and then the recorder clicked and Jackson later turned the tape over  (DMF ¶ 27, Exh. 35 at 83:26-84:7)  Longanbach and O'Brien received the tape shortly after it was created - and now the first half of it was missing. (DMF ¶ 27)

In addition, Scott Davis originally told detectives that Harless and Flanders were away walking hand-in-hand with their backs to Genzler when Genzler went after Harless. (Exh. 30 at  00820:23-00821:24) Davis drew a diagram showing the positions.   (Exh. 31) Later, after meeting with Longanbach, Davis testified at the preliminary hearing that Flanders was near the curb and Harless was 5 to 7 feet from Genzler's car.  (Exhibit 35 at 180:13-17) And he drew a diagram which places the people at the scene a distinctly different positions then what he previously indicated. (Exhibit 31)

In her recorded statement, Flanders describes  Harless as the aggressor who was "on top" of Genzler. (DMF ¶ 15-17) Prior to taking the stand, Flanders was told by Longanbach and O'Brien that she needed to testify consistently with Mr. Davis' version of the altercation.  (DMF¶ 33)  The tape of her interview  was not turned over to Genzler until after the preliminary hearing. (DMF ¶ 25, 33)  The tape was not turned over to Genzler until after the preliminary hearing wherein Flanders was told to testify under oath for the first time about what she saw and knew. (DMF ¶ 24, Exh. 19, 20, 24, 38)

On May 21, 1996, at a hearing on a motion for a continuance of the preliminary hearing before the Honorable Adrienne Orfield, Genzler's attorney asked to review this critical information before the preliminary hearing so that he could be prepared to examine the witnesses. (DMF ¶ 25, 28) Longanbach stated that he was not aware of the existence of, inter alia, the percipient witnesses' taped statements, despite the fact that they were more than one month old at the time. (DMF ¶ 25, 31) The tapes and an enormous amount of other material was either not turned over or was turned over in such a manner that Genzler's attorneys were unable to use them at the preliminary hearing. (DMF ¶ 31, 34) Genzler's attorneys did not have the benefit of the materials and therefore could not cross-examine the witnesses.

01 cv 1462 K (RBB)

1  (DMF ¶ 34, 32)

2         Still further, John Belsan was a witness who testified for Longanbach about "similar acts" of

3  violence involving Genzler. (DMF ¶ 37, 39, 40, 43) His testimony was based on an incident that

4  allegedly occurred on July 18, 1993, when Belsan was working as a bouncer at a Pacific Beach bar

5  where Genzler and others were patrons. (DMF ¶ 37) An altercation occurred involving several patrons.

6  (DMF ¶ 37) Genzler was neither arrested by the SDPD nor prosecuted with respect to this incident.

7  (Exhibit 47) Belsan was interviewed on the night of the incident by the San Diego Police Department

8  who generated a four page report. (Exhibit 47) Belsan also was treated at Mission Bay Hospital. (DMF

9  ¶ 44) At trial, Belsan testified that Genzler came up from behind, and "hit me across the shoulders with

10 something, a pipe, stick, board." (DMF ¶ 40) He also testified about his injuries and medical treatment

11 at Mission Bay Hospital. (DMF ¶ 44) When Belsan testified, his description of how the incident began,

12 the altercation itself, and his injuries differed dramatically from what is reflected in the police report.

13 (DMF ¶ 44) Genzler's attorney did not have the Incident report or the medical records with which to

14 impeach Mr. Belsan. (DMF ¶ 42) However, when the custodian of records from Mission Bay Hospital

15 testified, she stated that she had given Belsan's records to O'Brien. (DMF ¶ 42, Exh. 73, 71 at 01622)

16 O'Brien had secured the reports and records related to the incident and then the evidence was never

17 provided despite a specific request. (Exh. 71 ) When to Incident Report and medical records were

18 eventually turned over by the AGO in 1999, the Incident Report patently controverted testimony related

19 to the use of any type of weapon, (Exhibit 47) and the medical records contradict Mr. Belsan's testimony

20 related to his injuries. (DMF ¶ 42)

21         The fax copy of the "Belsan Report" (Exh. 47) was eventually disclosed to Genzler by the AGO.

22 That document contains a fax confirmation line which indicates that the report was faxed to the 8th floor

23 of the Hall of Justice, on June 4, 1996. (DMF ¶ 44; Exhibits 52, 74) This is the floor where Longanbach

24 worked and that number that it was sent to was for the fax machine that Longanbach used. (DMF ¶ 44;

25 Exhibits 52, 74) The District Attorney's office turned over the "Belsan Report" to the AGO in 1999.

26 (Exhibits 52 and 74) The only information related to the Belsan incident provided to Genzler by the

27 District Attorney's Office prior to that was police contact log (MIO Summary) which identified the date

28 of the incident without any other information. (DMF ¶ 44; Exhibits 52 , 54, 74)

1   Longanbach used the Belsan testimony in his closing argument as proof that Genzler was the

2   "master of the sneak attack . . . I think we also see a pattern. The defendant is the master of the surprise

3   attack, the sneak attack. That's what he did with John Belsan." (Exhibit 72 at 3165)

4   On June 20, 1996, the prosecution was aware of Genzler's desire to obtain the report when

5   attorney Blank sent a letter to Longanbach asking for names of all witnesses and any statements of the

6   witnesses. (Exhibit 51) After the request, but prior to the trial, Longanbach not only refused to produce

7   the report despite a court order, but he then also denied that the report even existed. (Exhibit 48 at 1790,

8   Exhibit 49 at 2370-73, Exhibit 50 at 3057-68) The report was finally produced by AGO in 1999, after

9   they took over the case, and well after Genzler's 1996 conviction. (DMF ¶ 44, Exhibit 47)

10   In addition to the above witnesses, Longanbach granted Sherry Logel, at an evidentiary hearing

11   before the Honorable Joan P. Weber on August 22, 1996, immunity from prosecution in exchange for

12   testimony favorable in his case against Genzler. (DMF ¶ 45) The grant included immunity for past acts

13   of perjury and future acts of lying on the stand at the trial of plaintiff. (DMF ¶ 45, 47) In essence,

14   Longanbach obtained for Logel a "get out of jail free" card for lying on the stand. Longanbach then

15   motivated Logel to lie by threatening to take her children away from her if she did not testify consistently

16   with his desired version of the "facts." (DMF ¶ 52) Her testimony attempted to make Genzler's attorney,

17   Gerald Blank, an accessory after-the-fact by accusing him of tampering with evidence. (DMF ¶ 46)

18   Longanbach then used Logel's lies to argue that attorney Blank was now a witness who should not be

19   allowed to represent Genzler. (DMF ¶ 47, 48) Judge Kennedy warned Longanbach that he did not want

20   to be "sandbagged" on this issue. (DMF ¶ 49) Longanbach bluntly assured Judge Kennedy that he

21   would call both Logel and attorney Blank at trial. As a direct result of Longanbach's accusation,

22   attorney Blank was recused from the case, thereby eliminating Genzler's attorney of choice based on

23   perjured testimony. (DMF ¶ 49, 50, Exhibit 83) Longanbach never called either Ms. Logel or Mr. Blank

24   to the stand at trial. (DMF ¶ 51)

25   Based on the above re-manufacturing of evidence, on February 10, 1997, Genzler was convicted

26   of second degree murder. (DMF ¶ 55) He was sentenced to 20 years to life in prison. (DMF ¶ 55)

27

28

**B.   LONGANBACH IS NOT ENTITLED TO PROSECUTORIAL IMMUNITY**

1.   **Longanbach has not met his burden of showing that subornation of perjury, manufacturing evidence and tampering with evidence entitles him to absolute immunity**

The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.  The presumption is that qualified (not absolute) immunity is sufficient to protect governmental officials in the exercise of their duties.  Milstein v Cooley, 257 F. 3d1004 (9th Cir., 2001), citing Buckley, 509 U.S. at 269, 274 and Burns, 500 U.S. at 486-487.  In the instant matter, Longabach has failed to demonstrate that he is entitled to any immunity, much less absolute prosecutorial immunity.  Rather, he has only attempted to argue that his acts of suborning perjury, tampering with evidence and witnesses, and failing to perform ministerial functions are cloaked in absolute immunity because they have some vague relevance to a criminal case that is to be heard before a judicial body.  This court has previously ruled that the absolute immunity does not apply in the instant case since "hiding and withholding evidence, tampering with recorded witness statements, tampering with witnesses, suborning perjury and altering investigative reports [are] actions which I hold outside the scope of absolute prosecutorial immunity under Milstien and also are properly characterized as part of the investigatory rather than the prosecutorial process" (October 30, 2001, Ruling on Motion to Dismiss, pg. 6:18-21) By the facts presented in support of this opposition, plaintiff has presented evidence showing that there is a triable issues of fact as to whether or not Longanbach was engaged in conduct which would bar him from any claim of qualified immunity.

In the interim, it should be noted that there is nothing contained in Longanbach's moving papers which differs from the arguments he raised in his motion to dismiss pursuant to FRCP 12(b)(6).  The instant motion is merely Longanbach revisiting that motion without any new arguments other than his blanket denial of the conduct alleged and his hose that Genzler cannot prove any the allegations.

This court has already ruled that, as it relates to Longanbach's purported immunity, that if the factual allegations contained in Genzler's FAC[1] are proven, then "hiding and withholding evidence, tampering with recorded witness statements, tampering with witnesses, suborning perjury and altering

---

[1] Those decisions are contained in the court's October 30, 2001, ruling on defendants' motion to dismiss (12(b)(6)) and January 23, 2002, ruling on the motion for reconsideration.

1  investigative reports [are] actions which I hold outside the scope of absolute prosecutorial immunity

2  under Milstien and also are properly characterized as part of the investigatory rather than the

3  prosecutorial process" (October 30, 2001, Ruling on Motion to Dismiss Pursuant to Rule 12(b)(6) , pg.

4  6/18-21)

5      In reaching its decision this court recognized that prosecutorial immunity, like judicial immunity,

6  extends to a prosecutor who acts *within his or her authority* and in a quasi-judicial capacity.  Imbler v.

7  Pachtman, (1976) 424 U.S. 409, 430-31, 96 S.Ct. 984, 994-96; The focus is on the nature or function

8  of the prosecutor's activity. Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675, 678 (9th

9  Cir.1984).

10      In Imbler, the high court held that state prosecutors are absolutely immune from liability under

11  section 1983 for conduct that is "intimately associated with the judicial phase of the criminal process."

12  (Id. at pp. 430-431, 96 S.Ct. at p. 995.)   Such conduct includes initiating a prosecution and presenting

13  the state's case  (Id. at p. 431, 96 S.Ct. at p. 995), and participating in a probable cause hearings. (Burns

14  v. Reed, (1991) 500 U.S. 478, 487, 111 S.Ct. 1934, 1937, 114 L.Ed.2d 547.) In Buckley v. Fitzsimmons,

15  509 U.S. 259, 113 S. Ct. 2606 (1993), the Supreme Court held that a prosecutor was not acting as an

16  advocate either when he held a press conference, or when he allegedly fabricated evidence concerning

17  an unsolved crime, stating:

18      There is a difference between the advocate's role in evaluating evidence and interviewing
    witnesses as he prepares for trial, on the one hand, and the detective's role in searching

19      for the clues and corroboration that might give him probable cause to recommend that
    a suspect be arrested on the other hand. When a prosecutor performs the investigative

20      functions normally performed by a detective or police officer, it is neither appropriate nor
    justifiable that, for the same act, immunity should protect the one and not the other. Id.

21      at 273, 113 S. Ct. at 2616.

22      In his moving papers, defendant Longanbach hangs his hat on the erroneous belief that the

23  dividing line is the finding of probable cause to arrest, and that all conduct performed by a Deputy

24  District Attorney thereafter, including any and all investigatory conduct, should be deemed trial

25  preparation and prosecutorial in nature. This approach was specifically rejected in Buckley wherein the

26  Supreme Court chastised the Seventh Circuit for taking the unprecedented position that prosecutors were

27  entitled to absolute immunity because their alleged misconduct occurred during criminal proceedings

28  after a determination of probable cause. Id. at 265, 113 S.Ct. at 2611. The Buckley Court flatly held that

1 the reasoning of the Seventh Circuit did not provide an acceptable basis for concluding that either the

2 pre-indictment fabrication of evidence or the post-indictment press conference were functions protected

3 by absolute immunity. Such considerations were "irrelevant" to the question whether the conduct of a

4 prosecutor is entitled to absolute immunity. Id. at 271, 113 S. Ct. at 2615. The holding in Buckley is

5 underscored in its footnotes:

6        Of course, a determination of probable cause does not guarantee a prosecutor absolute
         immunity from liability for all actions taken afterwards. Even after that determination a
7        prosecutor may engage in police investigative work that is entitled to only qualified
         immunity. The reason that lack of probable cause allows us to deny absolute immunity
8        to the state actor for the fabrication of evidence is that there is no common law tradition
         of immunity for it. Id. at 274, n. 5, 113 S. Ct. 2616, n.. 5.
9

10       The timing of the conduct in relationship to when probable cause is established is only one

11 consideration, and by no means conclusive on the issue. Almost any action by a prosecutor, including

12 his or her direct participation in purely investigative activity, could be said to be in some way related to

13 the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that

14 expansive. Id at 276, n. 6, 113 S.Ct. at 2617, n. 6 citing Burns v. Reed, 500 U.S. 478, 495, 111 S.Ct.

15 1934 1944 (1991).

16       Preparation, both for the initiation of the criminal process, and for a trial, may require the

17 obtaining, reviewing and evaluating of evidence. At some point, and with respect to some decisions, the

18 prosecutor no doubt functions as an administrator rather than as an officer of the court.  Drawing a

19 proper line between these functions may present difficult questions, but this case does not require us to

20 anticipate them. Although respondents rely on the first sentence of this passage to suggest that a

21 prosecutor's actions in "obtaining, reviewing, and evaluating" evidence are always protected by absolute

22 immunity, the sentence that follows qualifies that suggestion. It specifically confirms that some of these

23 actions may fall on the administrative rather than the judicial end of the prosecutor's activities. Buckley

24 509 U. S. at 276, n. 7, 113 S.Ct. at 2617, n. 7 citing Imbler v. Pachtman, 424 U.S. 409, 431, n. 33, 96

25 S.Ct. 984,995, n.33 (1976).

26       In this case, Longanbach threatened witnesses and induced them to change or manufacture their

27 testimony to comport with his desired theories.   As a matter of law, nothing about this conduct is

28 prosecutorial or judicial in nature. "Intimidating and coercing witnesses into changing their testimony

1   is not advocacy. It is rather a misuse of <u>investigative</u> techniques when a prosecutor performs an

2   investigative or administrative function rather than a prosecutorial one, absolute immunity is not

3   available." <u>Zahrey v. Coffey</u>, 221 F.3d 342, 346-47 (2d Cir. 2000).

4          Longanbach ordered his investigator O'Brien to rewrite and edit out of his investigative report

5   exculpatory material that would have supported Genzler's claim of self-defense.  The editing and

6   rewriting of investigative reports are the function of an investigator, not a lawyer because it is an act

7   which is commonly done by investigators. In <u>Kalina v. Fletcher</u>, 522 U.S. 118, 130, 118 S.Ct. 502, 509

8   (1997), the Supreme Court held that the prosecutor was not entitled to absolute immunity when she

9   "performed an act that any competent witness could have performed." Similarly, Longanbach is not

10  entitled to absolute immunity for performing an act that any competent investigator could have

11  performed. Longanbach's and O'Brien's alleged fabrications are far more egregious than what occurred

12  in <u>Buckley</u> where the mere shopping for a favorable witness was deemed to constitute fabrication of

13  evidence that was not entitled to absolute prosecutorial immunity. 509 U.S. at 276. Here, Longanbach

14  was not just hoping for someone to lie for them, he was creating the lies himself and coerced witnesses

15  to deliver them.

16         In <u>Milstein v. Cooley</u>, <i>supra</i>, the Ninth Circuit held that a prosecutor was not entitled to absolute

17  immunity if it can be demonstrated that he knowingly obtained false statements for the purpose of

18  prosecution. Although in <u>Milstein</u> the false statements were allegedly obtained before the grand jury was

19  empaneled, as <u>Buckley</u> clearly indicates, whether the misconduct occurs before or after the determination

20  of probable cause is irrelevant.  What matters is whether the conduct is "intimately associated with the

21  judicial phase" of a prosecution, and whether or not it constitutes appropriate "evaluation and

22  preparation" of evidence for trial.  In the instant case, the editing of the investigative report, the

23  manipulating witnesses, the manufacture of false evidence and the suppression of exculpatory evidence

24  occurred at several stages of the prosecution, including before the preliminary hearing. Regardless of

25  when it occurred, however, two things are clear. First, that the misconduct did occur and second, the

26  misconduct does not constitute appropriate evaluation and preparation of evidence that one contemplates

27  in a legitimate prosecution.  Rather, in each instance, the misconduct occurred in investigatory and

28  administrative realms, as Longanbach and O'Brien manufactured clues and corroboration and

1 | manipulated the disclosure of evidence to Genzler's counsel.

2 |       Longanbach contends that his manipulation of evidence was done within his role as an advocate

3 | for the state relying on Imbler, *supra*.  Longanbach misreads the facts of Imbler.  In that case the

4 | defendant prosecutor did not himself nor did he instruct anyone to manipulate the police artist's sketch.

5 | He had no part in the alleged tampering of evidence Rather, he was accused using the altered sketch in

6 | trial.  The Imbler court determined that the defendant prosecutor's actual use of the sketch *at trial* was

7 | within the role of an advocate since it occurred during a judicial proceeding. (Id. at 445)  That case in

8 | no way suggested that a prosecutor who manufactures, creates, destroys, plots to distort, or manipulates

9 | evidence is entitled to absolute immunity.

10 |       To the contrary, Imbler should be read as limiting the situations wherein a prosecutor is entitled

11 | to claim absolute immunity.  It should be noted that Longanbach overstates the holding of Imbler when

12 | he omits the word "only" (Longanbach MSJ p.8/) The quote, in its entirety actually says: "We hold only

13 | that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil

14 | suit for damages under § 1983."  Thus, it appears that acts other then deciding to bring a case to trial

15 | and/or argument and presentation of evidence before the court, are not entitled to absolute immunity,

16 | but rather only qualified immunity.

17 |       As the investigation of the case progressed and Longanbach began putting his case together, he

18 | realized that some of the witnesses who he hoped would testify about Genzler's alleged violent history,

19 | had severe credibility issues.  Putting a case together, including investigative work, are all well known

20 | parts of DDA's job, including investigative work which occurs after arrest, which we assume is after

21 | probable cause has been established.  (Exhibit 2: 10/16/98 deposition testimony of Gregory Thompson

22 | in Patrick Dutton vs. County of Riverside, et al. at 1169:27-1170:21)  "When the deputy D.A. is in this

23 | fact-gathering – on this fact-gathering mission, it's not simply a way to tune-up a case to go to trial.

24 | That's not the point. The point is to find the truth and then make some decisions. (Exhibit 2 at 1176:21-

25 | 25) In point of fact, Thompson ranks "follow-up investigation," including directing the police "after a

26 | preliminary hearing" as the second most important responsibility of a prosecutor's job.  (Exhibit 1:

27 | 5/26/99, Trial testimony of Gregory Thompson in Dutton v. County of Riverside (Case No. 267498) at

28 | 84:13-24) "Follow-up investigation" ranks behind only "obtaining witnesses cooperation." (Exhibit 1 at

83:27-84:1)

## 2.   Presentation of False Testimony at Trial

Longanbach knowingly presented false testimony at trial, testimony which he either suborned or manufactured.  Although Genzler concedes that the actual presentation of the false evidence by Longanbach at trial, standing alone, would entitle him to prosecutorial immunity, such evidence must be viewed as an integral part of the larger scheme of misconduct and intentional plan to deprive a citizen of his constitutional rights to a fair trial.  This is especially true when one considers that Longanbach's prosecutorial role in this case ended when the jury returned a verdict against Genzler in 1996.  At that point, Longanbach had a duty to divulge the exculpatory evidence, since the duty to divulge is ongoing.

Although the presentation of evidence itself may be cloaked in an absolute privilege such that those specific acts alone will not entitle a plaintiff in a 1983 action to damages, those acts cannot be ignored since that are an integral  part of the overall plan to violate Genzler's rights.   This evidence consummates the violation.  As was pointed out in Zahrey v. Coffey, 221 F.3d 342 (2nd Cir. 2000), the manufacture of false evidence, "in and of itself," does not impair anyone's liberty unless the false evidence is acted upon.  Thus, if Zahrey had claimed only that Coffey fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of Zahrey's liberty, no constitutional violation would have been alleged. See Buckley v. Fitzsimmons, 20 F.3d 789, 795 (7th Cir. 1994) (Buckley IV) (if prosecutor tortured witness to obtain statement implicating defendant and put the statement "in a drawer, or framed it and hung it on the wall but took no other step," no constitutional right of defendant would be violated) (emphasis added); Landrigan v. City of Warwick, 628 F.2d 736, 744 (1st Cir. 1980) ("[W]e do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws."). Zahrey at 348.    Thus, the presentation of the evidence cannot be divorced from the misconduct preceding the presentation.

## C.   Longanbach Is Not Entitled to Prosecutorial Immunity for Post-conviction Misconduct

In Houston v Partee, 978 F.2nd 362 (1992) the court held that prosecutors who obtain exculpatory information after conviction and withhold it from defense are no longer "prosecuting" a case (note the parallel with the California immunity statute P.C. § 821.6 related to "instituting or prosecuting"

1   a case) even though the case is on appeal.  In the instant case, Longanbach possessed exculpatory

2   evidence related to several witnesses and the events that resulted in Harless' death.  When the jury

3   returned the verdict (or shortly thereafter), Longanbach continued to withhold exculpatory evidence.

4   This was clearly done after his role as prosecutor ended.  Also, when Genzler's case was remanded for

5   retrial after Genzler's successful appeal, Longanbach was not involved in prosecuting it; in point of fact,

6   he had been transferred out of that trial division.  However, even though he was no longer assigned to

7   the case, his duty to disclose exculpatory evidence continued.  It is at this point in time, surely he had

8   a continuing duty to disclose, but did not do so, yet he was not involved in prosecuting the case.  Thus,

9   absolute immunity will not protect him from his failure to disclose at that time.

10       Here, Longanbach failed to perform an administrative duty (i.e. turn over exculpatory evidence).

11   Based on the testimony of Flanders (see above), it appears that Longanbach immediately recognized her

12   perceptions of events on April 19, 1996 and her recollection of Harless' prior violent history were

13   favorable to the defense when he said that divulging this information to Genzler would "slim their

14   chances" of getting a conviction. (FACPC)

15       It is not contested that this evidence is favorable to the defense. The reason for immunity is to

16   protect the prosecutor from liability for making a mistake about that sort of determination. Thus, the

17   mere ministerial duty to turn over what all agree is favorable evidence to Genzler is subject to only

18   qualified immunity, at best.

19   **D.**     **No qualified immunity**

20       Qualified immunity protects a public official from liability for conduct that "does not violate

21   clearly established statutory or constitutional rights of which a reasonable person would have known."

22   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As the court wrote in Deveraux v. Abbey (9th Cir. 2001)

23   263 F.3d 1070:

24       In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme
         Court clarified the two-step qualified immunity inquiry.  To decide whether a defendant is

25       protected by qualified immunity, a court must first determine whether, "[t]aken in the light
         most favorable to the party asserting injury, ... the facts alleged show the officer's conduct

26       violated a constitutional right." *Id.* at 2156.  If the plaintiff's factual allegations do add up
         to a violation of the plaintiff's federal rights, then the court must proceed to determine

27       whether the right was "clearly established," *i.e.,* whether the contours of the right were
         already delineated with sufficient clarity to make a reasonable officer in the defendant's

28       circumstances aware that what he was doing violated the right. *Id.* In essence, at the first

---

16                                                                        01 cv 1462 K (RBB)

1   step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights.
    If they do, then, at the second step, the question is whether the defendant could nonetheless
2   have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's
    rights. *See id.* at 2158 ("The concern of the immunity inquiry is to acknowledge that
3   reasonable mistakes can be made as to the legal constraints on particular police conduct.").
    Undertaking the first step of the two-step qualified immunity inquiry, we are persuaded that
4   there is a clearly established constitutional due process right not to be subjected to criminal
    charges on the basis of false evidence that was deliberately fabricated by the government.
5   Id. *at 1074, 1075*

6
    In Buckley, the United States Supreme Court made the following observation:
7
    Since *Tenney,* we have recognized two kinds of immunities under section 1983. Most public
8   officials are entitled to only qualified immunity. Under this form of immunity, government
    officials are not subject to damages liability for the performance of their discretionary
9   functions when 'their conduct does not violate clearly established statutory or constitutional
    rights of which a reasonable person would have known'." Buckley, 509 U.S. at 268, 113
10  S.Ct. at 2613 quoting Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738.

11      A court considering a defense of qualified immunity to a claim based on section 1983 must first

12  determine whether the plaintiff has alleged the deprivation of an actual constitutional right, and if so,

13  whether that right was clearly established at the time of the alleged violation. Wilson v. Layne, 526 U.S.

14  603, 609, 119 S.Ct. 1692 (1999).

15  **1.      Longanbach Deprived Genzler of Actual Constitutional Rights**

16      Longanbach's conduct cannot be viewed in a vacuum. He created and used false evidence, hid

17  exculpatory evidence, then suborned and used perjured testimony. These acts were done in order to

18  secure a wrongful conviction thereby depriving him of a constitutionally guaranteed liberty interest.

19  Genzler was sentenced to 20 years for second degree murder based on false and manufactured evidence.

20  These acts violate a fundamental and long established rule of Federal Constitutional Jurisprudence that

21  the Due Process Clause of the Fourteenth Amendment "cannot tolerate a state criminal conviction

22  obtained by the knowing use of false evidence." (Miller v. Pate (1967) 386 U.S. 1, 7.) Subsumed in this

23  rule is the understanding that the prosecution, by way of its administrative and investigative functions

24  cannot tolerate the manufacture and/or destruction of evidence for the purpose of gaining a conviction.

25  The United States Supreme Court made clear its position that the prosecution cannot deprive a citizen

26  of his constitutional right to a fair trial so as to obtain a conviction through the use of manufactured

27  evidence and suborned perjured testimony. In Napue v. Illinois (1959) 360 U.S. 264, it decreed that the

28  prosecution may not use false evidence or testimony under any circumstances. The court said:

1    The principle that a State may not knowingly use false evidence, including false testimony,
     to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to
2    apply merely because the false testimony goes only to the credibility of the witness.  The
     jury's estimate of the truthfulness and reliability of a given witness may well be
3    determinative of guilt or innocence, and it is upon such subtle factors as the possible interest
     of the witness in testifying falsely that a defendant's life or liberty may depend."
4    (Id., at p.269; see also: In re Pratt (1999) 69 Cal.App.4th 1294, 1316; In re Kasim (1997)
     56 Cal.App.4th 1360, 1385.)
5

6        As demonstrated above, Longanbach not only knowingly used false evidence and false testimony

7    to obtain a tainted conviction, he created the false evidence and false testimony by coercing and

8    pressuring witnesses.  "The knowing use by the prosecution of perjured testimony in order to secure a

9    criminal conviction violates the Constitution." Deveraux, supra, at 1075, citing Pyle v. Kansas, (1942)

10   317 U.S. 213, 216.

11       Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases
         that have expressly recognized this specific right, but that does not mean that there is no
12       such right.  Rather, what is required is that government officials have "fair and clear
         warning" that their conduct is unlawful."  See United States v. Lanier, 520 U.S. 259, 271,
13       117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ... see also Giebel v. Sylvester, 244 F.3d 1182,
         1189 (9th Cir.2001) ("Precedent directly on point is not necessary to demonstrate that a right
14       is clearly established.  Rather, if the unlawfulness is apparent in light of preexisting law,
         then the standard is met.  In addition, even if there is no closely analogous case law, a right
15       can be clearly established on the basis of common sense." (emendations, internal quotation
         marks, and citations omitted)). Id.
16

17       Since the knowing use of perjured testimony and manufactured evidence is and had been a clear

18   14th Amendment violation, how can anyone reasonably contend that the actual creation and subornation

19   of perjury and manufacturer and/or destruction of evidence not constitute an even more egregious

20   violation?  Genzler had a constitutional right not to be convicted and deprived of liberty and,

21   consequently, his property in defending his liberty interest as a result of any government officer's

22   fabrication of evidence, subornation and use of suborned perjured testimony and undisclosed of

23   exculpatory evidence after being denied representation by counsel of his choice.

24       In the instant case, Genzler provides ample evidence creating a triable issues of material fact that

25   Longanbach suborned perjury and tampered with evidence so as to violate Genzler's Fourth and

26   Fourteenth Amendment rights not to be deprived of a fair trial and wrongfully convicted.  Defendants

27   have no basis for contending, nor do they contend, that these rights were not well established in 1996.

28   They were. (See Zahrey, supra, 221 F.3d 355-56, Barbera v. Smith, (2d Cir. 1987) 836 F.2d 96, 99 (the

---

1  right not to be deprived of liberty as a result of any government officer's fabrication of evidence or

2  suborned perjured testimony); <u>Brady v. Maryland</u>, (1963) 373 U.S. 83 (the right to timely disclosure of

3  exculpatory evidence); <u>People v. Courts,</u> (1985) 37 Cal.3d 77; <u>Maxwell v. Superior Court,</u> (1982) 30

4  Cal.3d 606; <u>Alcocer v. Superior Court,</u> (1988) 206 Cal.App.3d 951; <u>People v. Burrows,</u> (1990) 220

5  Cal.App.3d 116 (the right not to be deprived of counsel of one's choice).

6        Each of these rights was clearly established at the time of the violations. None of the defendants

7  can assert that they reasonably believed that the above conduct was not violative of Genzler's right to

8  a fair trial or that Genzler's conviction for second degree murder based on perjured testimony,

9  manufactured evidence and hidden discovery was not depriving him of a constitutional liberty.

10       This is especially true given that the destruction of evidence supporting his self-defense claim

11 through the use of threats, intimidation and coercion was the subject of <u>In re Martin</u> (1987) 44 Cal.3d

12 1, a case arising out of the San Diego County District Attorney's Office. There the Supreme Court found

13 that the deputy district attorney's intimidation of potential defense witnesses such that they later refused

14 to testify on the accused's behalf was found to be a serious due process violation. (<u>Id.</u>, at 34-37.) The

15 court noted that the intimidation of witnesses is not limited to threats resulting in their failure to appear

16 on the stand.  It also includes coercive actions that result in a witness with exculpatory information

17 taking the stand and making false inculpatory statements such as Ms. Flanders, Mr. Davis, Mr. Ernst and

18 Ms. Logel did. (<u>Id.</u>, at 30 at fn.5)  The only difference between the instant matter and <u>In re: Martin</u> is

19 that the coerced witnesses in <u>In re Martin</u> were pressured into  withholding evidence by not taking the

20 stand, whereas in Genzler's case, the witnesses were coerced into taking the stand so as to provide

21 inculpatory perjured testimony; an act far more damaging to a criminal accused.

22       It should also be noted that the prosecuting attorney who engaged in the alleged misconduct in

23 <u>Martin</u> was James Pippen, Longanbach's supervisor in 1996.

24       The right not to be wrongfully convicted, imprisoned or deprived of liberty as a result of any

25 government officer's fabrication of evidence or subornation of perjury is apparent and established.  It

26 was most recently reiterated in <u>Zahrey v. Coffey</u>, 221 F.3d 342, 348 (2d Cir, 2000), wherein the court

27 noted that, like Genzler, the claim in <u>Zahrey</u>, "though premised on the manufacture of false evidence,

28 is not limited to that act."

---

1   Genzler has also clearly established that Longanbach used his administrative authority to

2   obfuscate the discovery process to the point that exculpatory evidence was either not turned over or it

3   was turned over in such a manner so as to adversely impact Genzler's ability to defend himself in the

4   criminal action. Case law is this area is clear, the right to exculpatory evidence is a must if this system

5   is to function.  *Penal Code § 1054.1(e)*, prosecuting attorney must disclose any exculpatory evidence;

6   People v. Jackson (1991) 235 Cal.App.3d 1670, People v. Sharparnis, (1983) 147 Cal.App.3d 190,

7   People v. Filson, (1994) 22 Cal.App.4th 1841,evidence directly opposing the defendant's guilt must be

8   disclosed; People v. Collie, (1981) 30 Cal.App.3d 43, 54, Wardius v. Oregon, (1973) 412 U.S. 470,

9   Hobbs v. Municipal Court, (1991) 233 Cal.App.3d 670, evidence supporting defense testimony must be

10  disclosed; Brady v. Maryland, (1963) 373 U.S.83, evidence mitigating defendant's culpability must be

11  disclosed;  People v. Boyd, (1990) 222 Cal.App.3d  1541, 568-69, prosecutor must disclose evidence

12  that impeaches the credibility of a material prosecution witness, including contrary/conflicting

13  statements).

14   The duty of a prosecutor to disclose exculpatory evidence is only subject to absolute immunity

15  to the extent that the prosecutor is acting in an evaluative, as opposed to an administrative role.  Once

16  it is determined that the information possessed by the State is discoverable, the prosecutor must disclose

17  it.  There is no discretion involved.  In this case, not only was information related to what Sky Flanders

18  saw and knew discoverable, but once the decision was made that it potentially was, Longanbach had an

19  absolute duty to produce it. *Penal Code § 1054.1(f)* requires that all reports related to prosecution

20  witnesses, written, recorded or oral, be disclosed. Thus, the actual disclosure of evidence, including oral

21  statements, is not a prosecutorial function, but rather an administrative one.

22   Further, the evidence shows that the sole basis for Judge Kennedy's recusal order was the

23  perjured testimony of Ms. Logel and Longanbach's assertions that attorney Blank would be a witness

24  at trial.  It resulted in complete exclusion of Mr. Genzler's chosen counsel from the courtroom.  He

25  couldn't even remain at counsel table. "You're off the case" was the ruling. (R.T., pp.1711-1712.)

26   The constitutional right to counsel of one's choice is one of the bedrocks of our legal system. The

27  Court of Appeals, Fourth Appellate District, in overturning Genzler's 1996 conviction, relied on

28  Maxwell, *supra*, which states that "One due process requirement is that an individual charged with

1  serious crime be represented by competent and independent counsel. Another is that courts generally

2  must not interfere with defendant's informed conclusions as to how his defense ought to be conduct."

3  Id. at 609.  A judge's discretion to recuse is "severely" limited.  Id. at 613.  An attorney should only be

4  removed under "flagrant circumstances."  Id. at 619.

5         Here, Longanbach intentionally acted so as to artificially create a situation wherein Judge

6  Kennedy felt that "flagrant circumstances" existed such that Mr. Blank had to be recused.  This belief

7  was created by Longanbach's subornation and subsequent use of perjured testimony and his blatant

8  misrepresentations to the court that Blank and Logel would be called to the stand as witnesses at trial.

9         It is difficult for anyone to look at the acts set forth herein and believe that Longanbach or any

10 other prosecutor could have a reasonable belief that what he was doing was not violating Genzler's right

11 to a fair trial.

12                                          **V.**

13                                    **CONCLUSION**

14       For the foregoing reasons, defendant's motion to dismiss should be denied in its entirety.

15 Dated:  July 29, 2002                    Respectfully submitted,

16                                          HOSEY & BAHRAMBEYGUI

17

18                                          By: _____

19                                               Patrick L. Hosey
                                                 Attorneys for Plaintiff
20                                               DAVID GENZLER

21

22

23

24

25

26

27

28

---

                                    21                          01 cv 1462 K (RBB)